UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
SUNGCHANG INTERFASHION CO., LTD.,                           :
                                                            :
                        Plaintiff,                          :          12 Civ. 7280 (ALC) (DCF)
                                                            :
            -against-                                       :          **ORDER AND OPINION**
                                                            :
STONE MOUNTAIN ACCESSORIES, INC.,                           :
STONE MOUNTAIN USA LLC, STONE                               :
MOUNTAIN USA CORP., KENNETH R. ORR,                         :
CHARLES ATANASIO, ROSENTHAL &                               :
ROSENTHAL, INC.                                             :
                                                            :
                        Defendants.                         :
                                                            :
------------------------------------------------------------X

**ANDREW L. CARTER, JR., United States District Judge:**

Defendants Stone Mountain USA LLC ("SMU LLC") and Stone Mountain USA Corp.

("SMU Corp.", and together with SMU LLC, "New SMA"), Rosenthal & Rosenthal ("R&R"),

Kenneth Orr and Charles Atanasio (collectively, the "Moving Defendants") move separately to

dismiss claims against them.  On December 12, 2012, Plaintiff SungChang Interfashion

("SungChang"), a Korean-based manufacturer of ladies' handbags, filed its Amended Complaint

("Am. Compl."), alleging that after receiving millions of dollars of SungChang's merchandise,

former customer, Defendant Stone Mountain Accessories ("SMA"), engaged in a series of

transactions with the Moving Defendants.  These transactions allegedly allowed SMA to

extinguish the heavy debts it owed to unsecured creditors like SungChang and allowed New

SMA to acquire SMA's assets to the detriment of SMA's unsecured creditors.[1]

---

[1] Another unsecured creditor and supplier brings similar claims in a related case. See Tommy
Lee Handbags Manufacturing Ltd. v. 1948 Corporation, 12-cv-3638 (ALC)(DCF).

SungChang sues all Defendants for fraudulent conveyance under New York Debtor & Creditor Law §§ 276, 276-a (Count I) and constructive fraudulent conveyance under New York Debtor & Creditor Law §§ 273-275 (Counts II, III & IV). SungChang also sues all Defendants for conspiracy to commit fraudulent conveyance (Count V). SungChang sues SMA only for breach of contract and account stated (Counts VI & VII)[2]; sues New SMA for successor liability (Count VIII); sues both SMA and Orr in his personal capacity for fraud and promissory estoppel (Counts IX & X); and sues New SMA, Rosenthal and Orr and Atanasio in their personal capacity for quantum meruit/unjust enrichment (Count XI). In addition to compensatory damages of no less than $2,667,510.65 plus interest, SungChang seeks punitive damages.

FACTUAL ALLEGATIONS

Defendant Stone Mountain Accessories ("SMA") is a Georgia corporation with principal place of business in New York. (Am. Compl. ¶ 10). SMA was in the business of designing, importing, selling and distributing ladies' accessories, small leather goods, wallets, and leather handbags, (id.), at least some of which were provided by SungChang, a handbag manufacturer based in Seoul, South Korea. Defendant Kenneth Orr was the chief executive officer of SMA. Defendant R&R was the factor for SMA, loaning funds in exchange for accounts receivable. In 2011 and 2012, SMA ordered shipments of handbags from SungChang approximately one to two times a month. SungChang provided SMA with an invoices, (id. ¶ 19), and alleges that SMA owes $2,667,510.65 for unpaid shipments sent in 2011 and 2012, (id. ¶ 8).

Until November 2011, SMA made timely payments to SungChang, (id. ¶ 21), but beginning November 3, 2011, SMA ceased making payments for the goods it received from

---

[2] SMA has not filed a motion to dismiss so the viability of Counts VI and VII—as well as other counts to the extent they are brought against SMA—is not considered herein.

SungChang, (id. ¶ 22).  Cho, the executive director and vice president of SungChang, repeatedly demanded payment from Orr, (id. ¶ 23), who allegedly told Cho that payment was forthcoming and requested that SungChang continue to ship handbags to SMA and release ocean bills of lading so that SMA could take possession of the handbags once delivered, (id. ¶ 24-25).  Orr allegedly explained that the release of the bills of lading and shipment of more handbags was necessary for SMA to obtain funds to make payments on older orders.  (Id. ¶ 26).  Relying on these representations, SungChang continued to fulfill orders and ship handbags to SMA.  SMA never rejected the goods or complained about their quality or condition and upon information and belief resold the goods at a significant markup.  (Id. ¶ 31-32).

SungChang alleges that SMA was unable to pay its debts and functionally insolvent by early 2012.  (Id. ¶ 35).  In March 2012, Orr sought out Atanasio, a long time friend as a potential business partner.  (Id. ¶ 36).  On April 11, 2012, Atanasio formed two corporate entities, SMU Corp. and SMU LLC, the New SMA entities "for the sole purpose of acquiring SMA's assets and inventory, but excluding any of its liabilities." (Id. ¶ 37).

Integral to this scheme was a "sham" public sale of SMA's assets undertaken by R&R, purporting to act in compliance with the Uniform Commercial Code, (id. ¶¶ 39-40), and a purported surrender of those assets to R&R by a fraudulent Peaceful Possession Agreement ("PPA"), (id. ¶¶ 41-48).  On April 27 and April 30, 2012, R&R placed ads in the New York Times and Crain's Classified, respectively, advertising the public sale of SMA's assets to be held on Monday, May 7, 2012 at 10 AM. (Id. ¶¶ 50-52).  On the day of the sale, R&R opened the auction with its starting credit bid of $300,000 for all SMA's tangible and intangible assets.  (Id. ¶ 52).  SungChang contends that R&R did not conduct an inventory of SMA's assets and so the bid was "a severe undervaluation" of SMA's assets.  (Id. ¶ 53-54).

On the same day as the public auction, SMA entered the Peaceful Possession Agreement ("PPA") with R&R. (Id. ¶ 42). The PPA states that SMA owed R&R "at least $3,350,420." In the PPA, SMA purported to surrender assets to R&R while "liabilities and/or obligations are and shall remain the sole and exclusive liability of SMA." (Id. ¶ 45). But according to SungChang, the PPA is a part of the fraud "to give the appearance of legitimacy to the fraudulent transfer of assets and inventory from SMA to the New SMA and Atanasio." (Id. ¶ 46). Instead, the Defendants intentionally overstated the amount of indebtedness and R&R does not have a legal or valid security interest in the amount asserted in the PPA. (Id. ¶¶ 47-48).

SungChang did not receive of the auction until after auction was scheduled to take place. By letter dated May 18, 2012, Orr announced the closure of Stone Mountain Accessories, Inc. effective May 7, 2012." (Id. ¶ 57). The letter also stated that SMA would be unable to satisfy its outstanding obligations to its trade creditors. By email dated May 21, 2012, Orr further explained that "the new Company does not have financial responsibility for past shipments" which "create[d] a tremendous shortfall for SungChang." (Id. ¶ 64).

After the public auction, New SMA purchased SMA's assets from R&R for a total purchase price of $1.5 million, to be paid in annual installments of 2% of New SMA's net sales. (Id. ¶ 62). Orr, CEO of SMA, is president of New SMA. (Id. ¶ 66). Atanasio is its CEO. (Id. ¶ 67). The majority of SMA's former employees were hired by New SMA and New SMA operates the same line of business from the same address as SMA. (Id. ¶ 68).

DISCUSSION

I.

I.   Standard of Review

      A.  Motion to Dismiss

4

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

On a motion to dismiss, the court will accept the plaintiff's allegations as true, see Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007), and must "draw all reasonable inferences in favor of the plaintiff," id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).  However, the court need not accept allegations that are merely conclusions of law.  Kassner, 496 F.3d at 237 (complaint inadequate if it "merely offers labels and conclusions or a formulaic recitation of the elements of a cause of action").  Therefore, on a motion to dismiss, "[t]he appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims." Fernandez, 471 F.3d at 51 (internal quotation marks and citation omitted).

"In considering a motion to dismiss, the Court may consider documents attached as an exhibit thereto or incorporated by reference, documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken. Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (internal citations omitted).  To incorporate a document by reference, "the Complaint must make a clear, definite and substantial reference to the document[ ]." Id. at 275-76.  Moreover, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce

5

[the document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (on a motion to dismiss, a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."). Notably, a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough. Chambers, 282 F.3d at 153.

B.   Discretion to Convert to Summary Judgment

"Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988); Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000). Thus, while a court must convert a motion to dismiss for failure to state a claim into a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court," Fed. R. Civ. P. 12(d), conversion is not required if the court disregards the extrinsic material. Cleveland v. Caplaw Enterprises, 448 F.3d 518, 521 (2d Cir. 2006) (matters outside the pleadings presented to the court were "excluded" within meaning of 12(d) by the district court's explicit refusal to consider the outside materials).

6

Here, R&R has presented extrinsic evidence about its status as a secured creditor of SMA and about the value of SMA's inventory, which would require conversion to a summary judgment motion. The Court declines to convert Defendant R&R's motion into one for summary judgment at this time, given the minimal discovery to date and the fact that some of the very documents relied upon for summary judgment are disputed as fraudulent. Therefore, I will only consider the complaint and any documents incorporated therein.

## II.  Choice of Law

Where jurisdiction is based on the diversity of parties, the Court must look to the choice-of-law rules of the forum state—New York—to determine which state's substantive law governs. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Beth Israel Med., Ctr. v. Horizon Blue Cross & Blue Shield of NJ, Inc., 448 F.3d 573, 582 (2d Cir. 2006). As some of the theories advanced by SungChang rely at least implicitly on piercing the corporate veil to reach the individual defendants in their personal capacity and successor liability, this Court considers (1) whether to pierce the corporate veil as to Orr for SungChang's fraudulent conveyance claims and unjust enrichment claims, (2) whether to pierce the corporate veil as to Atanasio for fraudulent conveyance claims and unjust enrichment claims and (3) whether New SMA is liable as successors for SMA's debts to SungChang.

Under New York's choice-of law-rules, a court first determines whether there is an actual conflict between the laws of the relevant jurisdictions. See Beth Israel, 448 F.3d at 582-83. An actual conflict exists where the applicable law from each jurisdiction provides differing rules that have the potential to affect the outcome of the case significantly. Finance One Public Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005). In the event of an actual conflict, the law of the jurisdiction having the greatest interest in the litigation will be applied.

7

See Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993).  To find that there is

an "actual conflict," the laws in question must provide different substantive rules in each

jurisdiction that are "relevant" to the issue at hand and have a "significant possible effect on the

outcome of the trial."  Finance One, 414 F.3d at 331.  While the Court need not determine if a

conflict of law would be outcome determinative, id., if a court finds that the effect would be the

same under either state's law, there is no actual conflict, id. ("[W]here *the court* determines that

the result would be the same under either jurisdiction's law, it need not decide which to apply.")

(emphasis in original) (citing Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190

F.3d 26, 30 (2d Cir. 1999)).

        In the absence of actual conflict with the law of New York as the forum state and the law

of the state with the greatest interest on the particular issue, New York law will be applied.  See

Wall v. CSX Transp., Inc., 471 F.3d 410, 422 (2d Cir. 2006) ("As there is no conflict, for

practical reasons, that is, for ease of administrating the case, New York, as the forum state,

would apply its law.").  The "facts or contacts which obtain significance in defining State

interests are those which relate to the purpose of the particular law in conflict."  Kalb, Voorhis &

Co., 8 F.3d at 132; see, e.g., Soviet Pan Am Travel Effort v. Travel Comm., Inc., 756 F. Supp.

126, 131 (S.D.N.Y. 1991) (applying New York law to underlying breach of contract claim and

Maryland law to veil-piercing and successor liability claims).

        Under New York law, the general rule is that the law of the state of incorporation

determines when the corporate form will be disregarded.  See Fletcher v. Atex, Inc., 68 F.3d

1451, 1456 (2d Cir. 1995); United Feature Syndicate, Inc. v. Miller, 216 F. Supp. 2d 198, 215

(S.D.N.Y. 2002); Soviet Pan Am, 756 F. Supp. at 131 ("Because a corporation is a creature of

state law whose primary purpose is to insulate shareholders from legal liability, the state of

incorporation has the greater interest in determining when and if that insulation is to be stripped away."). Only the incorporation of the relevant defendant matters for this analysis. See Planet Payment, Inc. v. Nova Information Systems, Inc., No. 07–cv–2520 (CBA)(RML), 2011 WL 1636921, at *7-8 (E.D.N.Y. March 31, 2011) (state of incorporation of alleged predecessor corporation not relevant to defendant corporations' liability).

A. Kenneth Orr

1. Veil Piercing in Georgia

Orr was CEO of SMA, a Georgia corporation. Under Georgia law, "[t]he corporate veil may be pierced where the parties themselves have disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." Earnest v. Merck, 183 Ga.App. 271, 273, 358 S.E.2d 661 (1987). It is applied in Georgia to "remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility." Jenkins v. Judith Sans Internationale, Inc., 175 Ga.App. 171, 171, 332 S.E.2d 687, 688 (1985) (internal quotation marks and citation omitted); Ellis v. Edwards, 180 Ga.App. 301, 348 S.E.2d 764 (1986) (plaintiff must allege abuse of the corporate form specifically for the purpose of promoting fraud, injustice, or evasion of tort or contractual responsibility).

To prevail based upon this theory, a plaintiff must allege that the shareholders disregarded the corporate entity and "made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist." Amason v. Whitehead, 186 Ga.App. 320, 321-22, 367 S.E.2d 107, 108 (1988). A further precondition is an allegation of "insolvency on the

9

part of the corporation in the sense that there are insufficient corporate assets to satisfy the plaintiff's claim." Johnson v. Lipton, 254 Ga. 326, 328 S.E.2d 533 (1985); Perry v. Unum Life Ins. Co. of America, 353 F. Supp. 2d 1237, 1240 (N.D. Ga. 2005) (granting defendant's motion to dismiss on alter ego theory where plaintiff had not pleaded that the corporation was insolvent); Adams v. Unum Life Ins. Co. of America, 508 F. Supp. 2d 1302, 1315 (N.D. Ga. 2007).

     2.  Veil Piercing in New York

In New York, "[t]he concept of piercing the corporate veil is a limitation on the accepted principle that a corporation exists independently of its owners, as a separate legal entity." Matter of Morris v. New York State Dept. of Taxation and Fin., 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993); International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292 (1948). Generally, piercing the corporate veil requires a showing that: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris, 82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157. To prevail on a claim veil-piercing claim, the plaintiff must prove both prongs of this test and the alleged wrongdoing must have "resulted in the plaintiff's injury," Id. "Where the challenged complaint lacks this causative element—i.e., the use of domination to cause the injury, it should result in the dismissal of the corporate veil-piercing allegation." CSX Transp., Inc. v. Filco Carting Corp., No. 10–CV–1055 (NGG)(JMA), 2011 WL 2713487, at *3 (E.D.N.Y. July 11, 2011) (quoting EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 513 (S.D.N.Y. May 19, 2005) (internal quotation marks and modifications omitted).

     Although Georgia requires insolvency of the corporation while New York law does not, this is not an actual conflict in this case because SungChang has alleged the insolvency of SMA.

On a motion to dismiss, SungChang's allegation that SMA was functionally insolvent would suffice under either Georgia or New York law to state a claim permitting a plaintiff to pierce the corporate veil. Thus, there is no actual conflict between Georgia and New York law on the piercing the veil standard, and I will apply New York law for any veil-piercing claims.

B. Charles Atanasio

Atanasio is the CEO of SMU LLC and SMU Corp., the New SMA entities. SMU Corp. is a New York corporation. SMU LLC is a Delaware corporation. His exposure to liability may vary to the extent Delaware and New York interpret the veil-piercing doctrine differently.

1. Veil Piercing in Delaware

For SMU LLC, I look to Delaware law. "Persuading a Delaware court to disregard the corporate entity is a difficult task." Harco Nat. Ins. Co. v. Green Farms, C.A. No. 1131, 1989 WL 110537 at *9-10 (Del. Ch. Sept. 19, 1989). But when the corporate form is misused, courts will pierce the corporate veil in order to prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. Transportes Aereos de Angola v. Ronair, Inc., 693 F. Supp. 102, 111 (D. Del. 1988) (quoting Zubik v. Zubik, 384 F.2d 267, 273 (3d Cir. 1967)); EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V., 2008 WL 4057745, at *11-12 (Del.Ch. Sept. 2, 2008) (same).

To state a cognizable claim to pierce the corporate veil of an officer, a plaintiff must allege facts that, if taken as true, demonstrate the officers' complete domination and control of the corporation such that the corporation "no longer ha[s] legal or independent significance of [its] own." Hart Holding Co. v. Drexel Burnham Lambert, Inc., C.A. No. 11514, 1992 WL 127567, at *11 (Del.Ch. May 28, 1992). In this inquiry, a court may consider: "whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and

directors functioned properly, and other corporate formalities were observed; whether the

dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply

functioned as a facade for the dominant shareholder." Harco Nat'l Ins. Co.. 1989 WL 110537, at

*4 (quoting United States v. Golden Acres, Inc., 702 F. Supp. 1097, 1104 (D. Del. 1988)).

A decision to disregard the corporate entity generally results not from a single factor, but

rather some combination of them, and "an overall element of injustice or unfairness must always

be present, as well." Id. at *5; Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood,

752 A.2d 1175, 1184 (Del.Ch. 1999) ("Effectively, the corporation must be a sham and exist for

no other purpose than as a vehicle for fraud.").

2.  Veil Piercing in New York

For SMU Corp, the analysis for piercing the corporate veil under New York law,

discussed above for Orr, applies.  For SMU LLC, there is no actual conflict between Delaware

and New York law on the piercing the veil standard.  Accordingly, I will apply New York law in

considering whether to pierce the veil as to Atanasio for either entity.

## II

I.  Fraudulent Conveyance (Counts I-IV)

SungChang brings claims for actual fraudulent conveyance, N.Y. Debtor and Creditor

Law ("N.Y. DCL") § 276, and constructive fraudulent conveyance under N.Y. DCL §§ 273, 274

and 275.  It is well-settled that New York does not recognize "a creditor's remedy for money

damages against parties who. . . were neither transferees of the assets nor beneficiaries of the

conveyance." Roselink Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 226 (S.D.N.Y.

2004) (quoting F.D.I.C. v. Porco, 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 910, 552 N.E.2d 158

(1990)) (alteration added); Gallant v. Kanterman, 198 A.D.2d 76, 80, 603 N.Y.S.2d 315, 318 (1st

Dep't 1993) (affirming dismissal of action for fraudulent conveyance where defendants were neither transferees or beneficiaries).  This is because "[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance...." Roselink Investors, 386 F. Supp. 2d at 226-27 (quoting Geren v. Quantum Chemical Corp., 832 F. Supp. 728, 736 (S.D.N.Y. 1993)); Chemtex, LLC v. St. Anthony Enterprises, Inc., 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007) (quoting Marine Midland Bank v. Murkoff, 120 A.D.2d 122, 508 N.Y.S.2d 17, 25 (N.Y. App. 2d Dep't 1986)).

A.  Standing for Fraudulent Conveyance Claims

The Court first considers whether SungChang has standing to bring a claim of fraudulent conveyance, as a claim must be dismissed for lack of standing regardless of whether the plaintiff adequately pleads fraudulent conveyance.

On a motion to dismiss, courts limit the standing inquiry to whether the plaintiff alleging fraudulent conveyance was a creditor of the transferor.  N.Y. DCL § 270 (" 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent"); Harris v. Coleman, 863 F. Supp. 2d 336, 341 (S.D.N.Y. 2012) ("In order to bring a fraudulent conveyance claim, the plaintiff must therefore be a creditor of the transferor [as] [n]on creditors can find no relief in a statute whose object . . . is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment.") (internal quotation marks omitted); Friedman v. Wahrsager, 848 F. Supp. 2d 278, 289-91 (E.D.N.Y. 2012) (on motion to dismiss, plaintiff had standing to assert fraudulent conveyance where it stood in the shoes of guarantors, who were "creditors" as defined in DCL § 270); Lippe v. Bairnco Corp., 230 B.R. 906, 914 - 915 (S.D.N.Y. 1999) (same).

13

SungChang has adequately alleged that it is a creditor of the Stone I entities within the meaning of the N.Y. DCL § 270 because it alleges that it is owed for goods that were delivered to the SMA for which it never received payment.  (Am. Compl. ¶¶ 30-31).  Thus, SungChang meets the standing threshold for its fraudulent conveyance claims at this stage.

B.  Actual Fraudulent Conveyance (Count I)

SungChang's actual fraudulent conveyance claims are brought pursuant to N.Y. DCL § 276, which provides:

> Every conveyance made and every obligation incurred with *actual intent,* as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. DCL § 276 (McKinney 2003) (emphasis added).

To survive a motion to dismiss on a DCL § 276 claim, a plaintiff must allege that a defendant acted with actual intent to hinder, delay, or defraud creditors and  must plead its allegations with particularity as required by Fed. R. Civ. P. 9(b).  See Atlanta Shipping Corp., Inc. v. Chem. Bank, 818 F.2d 240, 251 (2d Cir. 1987) ("Though DCL § 276 is triggered by an actual intent to hinder, delay, or defraud, all three means of damaging creditors are within a general category that the statute categorizes as "fraudulent.").  To prove actual fraud, a creditor must show intent to defraud on the part of the transferor.  HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995).

"Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  In re Sharp Intern. Corp., 403 F.3d 43, 56 (2d Cir. 2005) (quoting Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999). These "badges of

fraud" include: "a close relationship between the parties to the alleged fraudulent transaction; a

questionable transfer not in the usual course of business; inadequacy of the consideration. . . and

retention of control of the property by the transferor after the conveyance." Id.; see also HBE

Leasing Corp. v. Frank, 48 F.3d 623, 639 (2d Cir. 1995) ("Actual fraudulent intent ... may be

inferred from the circumstances surrounding the transaction, including the relationship among

the parties and the secrecy, haste, or unusualness of the transaction."); Lippe v. Bairnco Corp.,

249 F. Supp. 2d 357, 374-75 (S.D.N.Y. 2003).  Of course, the flip side of these badges of fraud is

that their absence—or evidence that fair consideration was paid, the parties dealt at arm's-length,

the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made

openly, or the transferor did not retain control—would constitute evidence that there was no

intent to defraud.  Lippe, 249 F. Supp. 2d at 375.

      SungChang alleges several of these badges of fraud across defendants:  the personal

relationship between Orr (CEO of SMA) and Atanasio (CEO of New SMA); their common

relationship with R&R; inadequacy of the consideration for SMA's assets; secretive transaction

in that creditors were not notified until after it had already taken place (although R&R's notice of

the public auction was statutorily sufficient, the fact that creditors were not informed of a sale

allegedly involving some of their assets is at least somewhat probative that the transaction was

kept quiet to avoid scrutiny or challenge); unusual timing of the surrender to R&R (the same day

as the public auction) all raise flags that the conveyance may have been fraudulent.

      Furthermore, R&R was alleged to benefit from the sale of the assets, which included

SungChang's merchandise, for which it did not pay.  New SMA was alleged to be the transferee

of the improperly-conveyed assets.  Based on these allegations, SungChang alleges sufficient

badges of fraud to survive dismissal of its actual fraudulent conveyance as to R&R and New SMA.

C.  Constructive Fraudulent Conveyance (Counts II, III & IV)

Under New York law, "a person challenging a transfer of the debtor's property as constructively fraudulent. . . must show that [the transfer] was made without fair consideration and (1) the debtor was insolvent or was rendered insolvent by the transfer, N.Y. DCL § 273, (2) the debtor was left with unreasonably small capital, id. § 274, or (3) the debtor intended or believed that it would incur debts beyond its ability to pay when the debts matured, id. § 275." Nirvana Rest. Inc. v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.), 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006); In re Vargas Realty Enterprises, Inc., 440 B.R. 224, 240 (S.D.N.Y. 2010).

"[T]he concept of fair consideration has two components—the exchange of fair value and good faith—and both are required." Lippe, 249 F. Supp. 2d at 376-77; Petersen v. Vallenzano, 849 F. Supp. 228, 231 (S.D.N.Y. 1994).  For purposes of a constructive fraudulent conveyance claim, the "good faith" at issue is the good faith of the transferee, as opposed to, in the case of actual fraud under § 276, the good faith of the transferor.  Lippe, 249 F. Supp. 2d at 377.

SungChang's complaint alleges a conveyance from SMA to R&R pursuant to the allegedly fraudulent PPA.  SungChang also alleges that functionally insolvent as of March 2012 when it had failed to pay SungChang for several months.  It also alleges that R&R did not pay fair value for the assets but rather executed a fraudulent PPA to facilitate a transfer of SMA's assets to New SMA.  The current assetholder, New SMA, is alleged not to have paid fair value for the goods it received because the purchase price of "not more than $1.5 million" allegedly

included the inventory of SungChang handbags for which payment was never made. (Am. Compl. ¶ 62).

      1.   N.Y. DCL § 275 (Count II)

In addition to lack of fair consideration, to state a claim under § 275, a plaintiff must allege that the Defendant intended or believed that it would incur debts beyond its ability to pay when the debts matured.[3] Circumstances of actual intent to incur debts beyond the ability to pay may include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. In re Borriello, 329 B.R. 367, 379 (Bankr. E.D.N.Y. 2005).

SungChang's allegation that the amount in the PPA was overstated can be construed as an allegation of the inadequacy of consideration. SungChang also alleges a close relationship between SMA's CEO, Orr, and Atanasio, the CEO of New SMA. The series of transactions after the incurring of debt, namely, the public sale, entering the PPA with R&R, and the sale to New SMA, all without the knowledge of SMA's creditors ultimately harmed SungChang who was unable to collect the amount allegedly owed by SMA. Finally, the fact that the surrender of assets by PPA took place on the same day as the public auction suggests that the money-free

---

[3] N.Y. DCL. § 275 provides: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

transaction of SMA's assets was planned all along.  These factors support SungChang's claim of constructive fraudulent conveyance under N.Y. DCL § 275.

### 2.  N.Y. DCL § 274 (Count III)

Besides lack of fair consideration, a plaintiff must allege that the debtor was left with unreasonably small capital after a transfer to state a claim under § 274.[4]  Here, SMA contends that it was unable to satisfy its outstanding obligations to its creditors after the public auction and subsequent sale to New SMA and the inability to pay for the old shipments "creates a tremendous shortfall for SungChang."  (Am. Compl. ¶ 59, 64).  These allegations substantiate the claim that SMA was left with unreasonably small capital after the transfer and state a claim under N.Y. DCL § 274.

### 3.  N.Y. DCL § 273 (Count IV)

A plaintiff must also allege the debtor's insolvency to state a claim under § 273.[5]  SungChang alleges that SMA was functionally insolvent by early 2012 (Am. Compl. ¶ 35) and that SMA shuttered its doors effective May 7, 2012, claiming inability to satisfy its outstanding obligations to [its] trade creditors" in its May 18, 2012 letter (Am. Compl. ¶¶ 57, 59).  These facts are sufficient to allege insolvency and state a claim under § 273.

---

[4] N.Y. DCL § 274 provides: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."

[5] N.Y. DCL § 273 provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

18

Having adequately pleaded a claim for fraudulent conveyance and its standing as a creditor of SMA, SungChang's fraudulent conveyance claims survive dismissal. R&R and New SMA's motions to dismiss are denied on Counts II, III and IV.

### D. Fraudulent Conveyance – Individual Defendants

#### 1. Direct Liability

As to the individual defendants (Orr and Atanasio), however, SungChang has not alleged that they were a transferor, transferee or beneficiary of the transfer. So there is no direct theory of liability for any fraudulent conveyance claim as to Orr and Atanasio. D'Mel & Associates v. Athco, Inc., 105 A.D.3d 451, 452, 963 N.Y.S.2d 65, 66 (N.Y. App. Div. 1st Dept. 2013) ("[I]n the specific context of fraudulent conveyances (as opposed to torts generally), [Defendants] who were not transferees of either conveyance-cannot be held liable without piercing the corporate veil unless they benefited from the conveyances.")

#### 2. Piercing the Corporate Veil

If SungChang seeks to pierce the corporate veil, "[t]he factors evincing the need to pierce the corporate veil remain relevant even in a fraudulent conveyance case." D'Mel & Associates, 105 A.D.3d at 452, 963 N.Y.S.2d 65; Fisher v. Zaks, 48 A.D.3d 251, 852 N.Y.S.2d 69 (1st Dep't. 2008) (absent evidence that corporation's owners exercised complete domination of the corporation with respect to the transaction at issue, that such domination was used to commit a fraud or wrong against plaintiff, resulting in injury, that corporation was insolvent, or that improper conveyances were made, piercing of corporate veil was not warranted).

Under New York law, "[f]actors to be considered in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of

corporate funds for personal use." East Hampton Union Free School Dist. v. Sandpebble Bldrs., Inc., 66 A.D.3d 122, 127, 884 N.Y.S.2d 94 (2d Dept. 2009) (internal quotation marks omitted).

"While it is not sufficient, at the pleading stage, to make conclusory allegations of control. . . setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss." In re Sunbeam Corp., 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002) (citing Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1144-45 (S.D.N.Y.1996). Thus, although establishing domination and control is "a heavy burden," TNS Holdings, Inc. v. MKI Secs. Corp., 92 N.Y.2d 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891 (N.Y. 1998), for the most part "piercing the corporate veil involves a fact laden inquiry, which is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss," Holme v. Global Minerals and Metals Corp., No. 600232/08, 22 Misc.3d 1123(A), 880 N.Y.S.2d 873, 2009 WL 387034, at *7 (N.Y. Sup. 2009) (citations omitted).

### a.   Orr

As to Orr, while SMA's actions allegedly harmed SungChang, those acts do not necessarily mean that Orr can be held personally liable without more. One allegation gives rise to a veil-piercing theory: as CEO of SMA, Orr "had decision making authority and total control over SMA's business operations." (Am. Compl. ¶ 29). But it is well established that to allege a cause of action against a shareholder or officer, "a plaintiff must do more than conclusorily state that the shareholder or officer exercises domination and control over the corporation. Rather, a plaintiff must allege specific facts showing that the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality." Strojmaterialintorg v. Russian American Commercial Corp., 815 F. Supp. 103, 105 (E.D.N.Y. 1993) (collecting cases).

This allegation is bolstered by other allegations about Orr's misrepresentations that payment was forthcoming and his subsequent correspondence announcing SMA's closure, a reality that Orr understood would "create[] a tremendous shortfall for SungChang" (Am. Compl. ¶ 64; id. ¶ 57-58, Ex. C). SungChang also pleads that SMA was inadequately capitalized, an allegation bolstered by Orr's admission that "[d]espite our best efforts we could not remain current with our obligations to our lender and had no other sources of financing." (Am. Compl. Ex. C).

SungChang has alleged some factors that justify disregarding the corporate form against Orr and given that "piercing the corporate veil involves a fact laden inquiry, which is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss," Holme, 2009 WL 387034, at *7, the Court finds that dismissing the fraudulent conveyance claims as to Orr would be improper at this time.

  b.  Atanasio

SungChang, however, does not allege any actionable involvement in the fraudulent conveyance as to Atanasio. If Atanasio's liability is based on his alleged assistance with Orr to strip SMA of its assets, this is not sufficient to allege personal liability because SungChang does not allege that Atanasio had domination and control over SMA's assets or personally benefitted from the conveyance of its assets. On the other hand, if SungChang's theory of his liability is based the fact that he is CEO of New SMA, this argument also fails as there is no allegation that Atanasio misused *New SMA's* assets or otherwise abused the corporate form of New SMA.

Besides a conclusory allegation that Atanasio exerts total control over New SMA (Am. Compl. ¶ 38), SungChang has not alleged that Atanasio abused the privilege of doing business in the corporate form by any of the East Hampton markers. SungChang certainly cannot allege

inadequate capitalization of New SMA when the crux of its claim is that New SMA is operating

with at least $2.6 million in SungChang's merchandise.  Furthermore, even if New SMA

obtained the assets with a fraudulent purpose, that does not mean that it was and is not a

legitimate business so that Atanasio should be held personally liable for fraudulent conveyance.

Assuming arguendo that Atanasio incorporated New SMA was incorporated for the sole purpose

of defrauding the creditors of SMA (Am. Compl. ¶ 37), that fact does not mean that the

parameters for piercing the corporate veil are reduced to nil.  In the absence of *any* factor that

Atanasio abused the privilege of doing business in the corporate form, SungChang cannot begin

to meet the "heavy burden" required to establish domination and control.  Thus, piercing the veil

would be inappropriate under New York or Delaware law and the fraudulent conveyance claims

against Atanasio are rightly dismissed.[6]

## II.  Conspiracy to Commit Fraudulent Conveyance (Count V)

"New York does not recognize "conspiracy" as an independent tort, but conspiracy

allegations may be used to connect the actions of separate defendants *with an otherwise*

*actionable tort*."  See Excelsior Capital LLC v. Allen, No. 11 Civ. 7373(CM), 2012 WL

4471262, at *12 (S.D.N.Y. Sept. 26, 2012) (internal citations and quotation marks omitted) ; In

re Magnesium Corp. of Am., 399 B.R. 722, 775 (Bankr. S.D.N.Y.2009) (no claim for civil

conspiracy lies unless "the plaintiff has adequately alleged an actionable underlying tort"); Ho

Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc., 665 F. Supp. 2d 239, 256 (S.D.N.Y.

---

[6] This finding does not affect SungChang's ability to pursue its claims directly against New
SMA, as evident from the Court's determination that SungChang has pleaded a cause of action
against New SMA.  It only recognizes that not every instance of corporate misbehavior merits
piercing the corporate veil where the plaintiff does not adequately allege domination and control.

2009) ("A claim of conspiracy cannot stand alone and must be dismissed if the underlying independent tort has not been adequately pleaded.").

If an underlying tort is adequately pleaded, to state a claim for conspiracy, a plaintiff must allege:

> (i) facts constituting a common agreement or understanding, (ii) a common design or objective, (iii) the tortious or criminal acts committed in furtherance of the common agreement and objective, (iv) the intent and knowledge of the defendants regarding the acts, and (v) damage or injury as a result of the acts of the defendants.

In re Magnesium Corp. of Am., 399 B.R at 775 (citing JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005)).

The conspiracy to commit fraudulent conveyance claim is dismissed against Atanasio because SungChang has not tethered its allegations to any underlying actionable tort. Fundación Presidente Allende v. Banco de Chile, No. 05 CV 9771(GBD), 2006 WL 2796793, at *3 (S.D.N.Y. May 29, 2006) ("A fraudulent conveyance conspiracy claim cannot survive absent a showing that defendants had control over the transferred assets or that they benefitted from the conveyance."); FDIC v. Porco, 75 N.Y.2d at 842 (DCL does not create a remedy against non-transferees who are not alleged to have domination or control over the conveyed assets or benefitted from the conveyance). Thus, there can be no claim for conspiracy to commit fraudulent conveyance against Atanasio as I have found SungChang's fraudulent conveyance allegations against him to be entirely lacking.

However, as to Orr, R&R and New SMA, SungChang has adequately alleged fraudulent conveyance claims. Furthermore, SungChang alleges facts constituting a common agreement, a common objective to transfer SMA's assets free of its liabilities to New SMA, and SungChang's injury from the common agreement. It also alleges acts in furtherance of the common agreement

23

and knowledge as to Orr, R&R and New SMA.  Accordingly, the motions to dismiss Count V for all Moving Defendants, except Atanasio, are denied.

III. New SMA's Successor Liability (Count VIII)

As with piercing the veil, New York courts determining successor liability have similarly concluded that the state with the most interest is the defendant corporation's place of incorporation.  See Planet Payment, Inc. v. Nova Information Systems, Inc., No. 07–cv–2520 (CBA)(RML), 2011 WL 1636921, at *7 (E.D.N.Y. March 31, 2011) (finding defendant's place of incorporation dispositive for successor liability choice of law analysis); Soviet Pan Am, 756 F. Supp. at 131 (finding that a successor liability claim, like a veil-piercing claim, implicates questions of corporate liability for the acts of others, and that the state of incorporation has the greater interest in such claims).

Because SMU LLC is a Delaware corporation and SMU Corp. is a New York corporation, I turn to the law of those states in determining whether successor liability is properly pleaded.  As SMU Corp. is a New York corporation and New York is the forum state, New York law applies to the successor liability claim for SMU Corp. regardless.  As for SMU LLC, I will apply Delaware law if there is an actual conflict with New York law.

Both New York and Delaware recognize the general rule that when one company sells or transfers all of its assets to another company, the acquiring company does not become liable for the debts or liabilities of the seller/transferor.  See, e.g., Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003).  But both states also recognize four exceptions to this rule: (1) where the buyer expressly assumed the debt at issue; (2) where the transaction was undertaken to defraud creditors; (3) where the transaction constitutes a de facto merger; or (4) where the successor is a mere continuation of the predecessor.  Id.; Schumacher v. Richards Shear Co.,

24

Inc., 59 N.Y.2d 239, 245, 451 N.E.2d 195, 19, 464 N.Y.S.2d 437, 440 (N.Y. 1983); Ross v. Desa

Holdings Corp., No. 05C–05–013, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept.30, 2008).

SungChang does not allege that New SMA expressly assumed responsibility for SMA's

debts. To the contrary, the PPA purported to keep SMA's obligations as "the sole and exclusive

liability of SMA." (Am. Compl. ¶ 45). Thus, only the *de facto* merger, mere continuation and

fraud exceptions are possibly applicable in this case.

A. De Facto Merger Exception

"The elements necessary to create a *de facto* merger under Delaware law are the

following: (1) one corporation transfers all of its assets to another corporation; (2) payment is

made in stock, issued by the transferee directly to the shareholders of the transferring

corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to

assume all the debts and liabilities of the transferor." Magnolia's at Bethany, LLC v. Artesian

Consulting Engineers Inc., No. S11 C–04–013, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept.

19, 2011).

Under New York law, "[t]he hallmarks of a *de facto* merger include: continuity of

ownership; cessation of ordinary business and dissolution of the acquired corporation as soon as

possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted

continuation of the business of the acquired corporation; and continuity of management,

personnel, physical location, assets and general business operation." Fitzgerald v. Fahnestock &

Co., 286 A.D.2d 573, 574, 730 N.Y.S.2d 70 (1st Dep't 2001); New York v. Nat'l Service Indus.,

Inc., 460 F.3d 201, 211 (2d Cir. 2006) (citing Cargo Partner, 352 F.3d at 46).

Accordingly, to state a claim for successor liability based on a *de facto* merger theory in a

breach of contract case under either New York or Delaware law, a plaintiff must allege

25

continuity of ownership between the selling and acquiring corporations. Courts in New York and in Delaware, however, interpret this element differently.  New York courts require only an allegation that shareholders of the selling corporation hold even an indirect interest in the assets. See, e.g., In re New York City Asbestos Litig., 15 A.D.3d 254, 256, 789 N.Y.S.2d 484 (N.Y. App. Div. 2005) ("The first criterion, continuity of ownership, exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets, as occurs in a stock-for-assets transaction."); Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 104–105 (S.D.N.Y. 2002).

In contrast, under Delaware law, the "continuity of ownership" element is only met if shareholders of the predecessor corporation acquire a *direct* ownership interest in the successor corporation. See, e.g., Magnolia's, 2011 WL 4826106, at *3 (for *de facto* merger, shares in the transferee corporation must be issued directly to shareholders of the transferring corporation); Hayden Capital USA, LLC v. Northstar Agri Industries, LLC, No. 11 CIV. 594 (DAB), 2012 WL 1449257, at *5 (S.D.N.Y. Apr. 23, 2012) (applying Delaware law); Fehl v. S.W.C. Corp., 433 F. Supp. 939, 947 (D. Del. 1977) ("Only in a few cases, where the consideration passed directly to the transferor's stockholders without coming into possession of the transferor corporation, has a *de facto* merger been found.").

Because different outcomes could possibly result depending on the law applied, there is an actual conflict and the law of the state with the greatest interest should apply.  As to SMU LLC, that state is Delaware, the state of incorporation, and thus Delaware law will apply.  As to SMU Corp., New York law will apply.

26

The scheme that SungChang alleges involves using R&R as a go-between to stage a public sale, facilitate the surrender of SMA's assets and subsequently allow New SMA to purchase those assets. Thus, even if accepted as true, the alleged ownership interest of Orr or SMA in New SMA's assets is indirect ownership and is insufficient to allege continuity of ownership under Delaware law. Therefore, the claims against SMU LLC for successor liability under a de facto merger theory must be dismissed.

Under New York law, however, indirect ownership is sufficient. What is more, "what the Plaintiff needs to show to ultimately prevail on a *de facto* merger claim and what the Plaintiff must plead to state a claim are two separate inquiries." Ortiz v. Green Bull, Inc., No. 10–CV–3747 (ADS)(ETB), 2011 WL 5554522, at *8 (E.D.N.Y. Nov.14, 2011). SungChang alleges that Orr, former CEO of SMA, is the current president of New SMA. Although the ownership relationship is not clear at this time, SungChang has not "concede[d] that it lack[ed] 'any factual basis,' as required by Fed. R. Civ. P. 11(b)(3), on which to plead continuity of ownership between [the predecessor corporation] and [the successor corporation]." Ortiz, 2011 WL 5554522, at *8 (quoting, and distinguishing, Cargo Partner, 352 F.3d at 46). Instead, SungChang's allegations of Orr's continued involvement in New SMA suggest that the peaceful possession of Stone I and sale of its assets was something more than an arms-length asset sale.

SungChang also alleges that SMA became functionally insolvent by early 2012 (Am. Compl. ¶ 35) and began a new entity at the same location in the same line of business precisely to avoid liability (id. ¶¶ 68-69). Therefore, under New York law, SungChang states a claim for de facto merger exception to establish successor liability as to SMU Corp.

B. Mere Continuation Exception

In New York, "[a] continuation envisions a common identity of directors [and] stockholders and the existence of only one corporation at the completion of the transfer." Societe Anonyme Dauphitex v. Schoenfelder Corp., No. 07 Civ. 489, 2007 WL 3253592, at *6 (S.D.N.Y. Nov. 2, 2007) (internal quotation marks omitted); Ladjevardian v. Laidlaw–Coggeshall, Inc., 431 F. Supp. 834, 839 (S.D.N.Y. 1977). Similarly, in Delaware, the primary elements of continuation include the common identity of the officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer. Magnolia's, 2011 WL 4826106, at *3 (Del. Super. 2011).

Notably, both states require narrow construal of the mere continuation exception such that it is only available where "it is not simply the business of the original corporation which continues, but the corporate entity itself." Colon v. Multi-Pak Corp., 477 F. Supp. 2d 620, 626-27 (S.D.N.Y. Mar 07, 2007) (quoting Ladjevardian, 431 F. Supp. at 839); Magnolia's, 2011 WL 4826106, at *3 (quoting Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *7 (Del. Super. Ct. April 13, 1988). Accordingly, there is no actual conflict between Delaware and New York law on the mere continuation exception, and I will apply New York law.

As discussed above, Orr's continued presence as president of New SMA suggests that SMA's corporate entity continued beyond the mere sale of its assets. Even though SungChang has not alleged formal dissolution, this defect is not detrimental as "the mere continuation exception is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors [so that] if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." Societe Anonyme, 2007 WL 3253592, at *6 (citation and internal quotation marks omitted) (modification added). SungChang alleges that SMA engaged in a

fraudulent conveyance and transferred its assets to a new entity to avoid the debt owed

SungChang. SungChang also alleges that SMA was functionally insolvent by early 2012 (Am.

Compl. ¶ 35) and that New SMA is in the same line of business as SMA operating from the same

location (id. ¶¶ 11-12). These allegations are enough to assert a theory of mere continuation to

survive Moving Defendants' motions to dismiss. Societe Anonyme, 2007 WL 3253592, at *5

(finding that plaintiff sufficiently alleged mere continuation where predecessor and successor

company had shared office space, shared an address, shared employees and management, and

where it was logical to infer that the successor company was created to avoid contractual

liability).

### C. Intent to Defraud Creditors

Finally, SungChang's Amended Complaint satisfies the exception allowing successor

liability where a transaction is conducted with intent to defraud creditors. The allegations of

fraud must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). SungChang alleges

with adequate specificity the facts of the alleged fraud: that (a) New SMA was formed to

frustrate and evade the creditors of its predecessor entity, SMA, and (b) the public auction and

subsequent sale to New SMA were effectuated by R&R, to legitimate the scheme (Am. Compl.

¶¶ 37, 49-54, 60-62, 69-71). Therefore, the intent to fraud exception applies and defeats New

SMA's motion to dismiss the successor liability claims.

### IV. Fraud (Count IX)

SungChang brings a cause of action for fraud against Orr and SMA. A claim for fraud

under New York law requires a showing of: "(1) a misrepresentation or material omission of fact

which was false and known to be false by defendant, (2) made for the purpose of inducing the

other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or

material omission, and (4) injury." Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413,

421 (1996). Accord Manning v. Utilities Mut. Ins. Co., 254 F.3d 387, 400 (2d Cir. 2001);

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996).  But

courts in the Second Circuit reject attempts to convert a breach of contract claim into a fraud

claim by merely alleging that a contracting party never intended to fulfill its promise under the

agreement. SKR Resources, Inc. v. Players Sports, Inc., 938 F. Supp. 235, 238 (S.D.N.Y. 1996)

(citing, inter alia, Strojmaterialintorg v. Russian Am. Commercial Corp., 815 F. Supp. 103, 105

(E.D.N.Y. 1993) ("a claim predicated on a breach of a contractual arrangement cannot be

converted into a fraud claim simply by allegations that a defendant never intended to adhere to

its obligations under the agreement")); Value Time, Inc. v. Windsor Toys, Inc., 700 F. Supp. 6, 7

(S.D.N.Y. 1988) (dismissing fraud counterclaim as a reiteration of the contract claim where party

bringing counterclaim pleaded no duty "separate and distinct from what appears within the four

corners of the agreements" ).

Orr contends that SungChang's fraud claim against him cannot stand because it is

duplicative of the breach of contract claim against the SMA.  (Orr Mem. at 14).  SungChang

counters that the fraud occurred after the contract was made, was intended to induce reliance on

Orr's claims of forthcoming payment but is somehow "not predicated on the contractual sale of

handbags to SMA, and the company's breach of that contract", but instead on Orr's

representations that payment was forthcoming and that continued shipments were necessary to

assist SMA in obtaining funds to make the payments, despite his knowledge that SMA would

soon be going out of business" (SungChang Opp. at 33).

SungChang's distinctions fail to support an actionable claim.  Even accepting Plaintiff's

argument that its fraud claim is based solely on Orr's misrepresentation that payment was

forthcoming, any obligation to repay stems only from the underlying contract between SMA and SungChang.  As the Second Circuit has explained:  "We may assume that these representations were intended to lull [SungChang] into a false sense of security and that they did so to [SungChang's] detriment.  However, these facts amount to little more than intentionally-false statements by [Orr] indicating his intent to perform under the contract. That is not sufficient to support a claim of fraud under New York law." Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19 -20 (2d Cir. 1996); Carlucci v. Owens-Corning Fiberglas Corp., 646 F. Supp. 1486, 1491 (E.D.N.Y. 1986) ("a claim predicated upon a breach of a contractual arrangement cannot be converted into a fraud claim simply by allegations that a defendant never intended to adhere to its obligations under the agreement").

　　　　Orr was acting on behalf of SMA when he solicited the additional shipments, a fact that SungChang's complaint implicitly acknowledges. E.g., (Am. Compl. ¶ 23 "repeatedly demanded payment from Orr for the *goods that SMA ordered*"); ¶ 24 ("Orr repeatedly told Cho that payment for the goods was forthcoming and that SungChang should continue to *ship additional handbags to SMA*"); ¶ 28 ("In reliance upon *Orr's representation that SMA would make full payment* when it obtained funds from the sale of newly shipped goods...")) (emphasis added).  Thus, Orr's alleged statements made after the contract was entered were "promissory— simply a representation regarding future intent to perform under the contract, not misrepresentations of present fact." EQT Infrastructure Ltd. v. Smith, 861 F.Supp.2d 220, 236 n.13 (S.D.N.Y. 2012) (citing Bridgestone/Firestone, Inc., 98 F.3d at 19-20); Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992) ("[P]romissory statements as to what will be done in the future ... give rise only to a breach of contract claim ....") (alteration and internal quotation marks omitted).  This does not even qualify as fraud in the inducement of a contract as

SungChang admits that, at least through November 2011, SMA was performing its contractual

duties to pay SungChang for shipments.  (Am. Compl. ¶ 22).

Despite the semantic splicing which SungChang has undertaken, it is to the same effect:

Orr's representations derive out of the contractual relationship between SungChang and SMA

because he was acting on behalf of the corporation.  Orr's alleged false promises do not support

an independent fraud claim.  SungChang's fraud claim against Orr is a thinly-veiled attempt to

improperly recover for SMA's alleged breach of its contractual obligations and must be

dismissed.

V.  Promissory Estoppel (Count X)

SungChang brings a cause of action for promissory estoppel against Orr and SMA.  Orr

also seeks to dismiss the claim, arguing that no basis exists for the claims since a written contract

on the subject matter exists.

To plead promissory estoppel, a plaintiff must allege: "(1) a clear and unambiguous

promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury

to the relying party as a result of the reliance." Readco, R.D.P. v. Marine Midland Bank, 81 F.3d

295, 301 (2d Cir.1996).  However, "[p]romissory estoppel is a legal fiction designed to substitute

for contractual consideration where one party relied on another's promise without having entered

into an enforceable contract." Bader v. Wells Fargo Home Mortg. Inc., 773 F. Supp. 2d 397, 414

(S.D.N.Y. 2011) (citation omitted); Hughes v. BCI Intern. Holdings, Inc., 452 F. Supp. 2d 290,

306 n. 19 (S.D.N.Y. 2006) ("[I]f plaintiffs were required to plead the existence of an enforceable

agreement, promissory estoppel would be indistinguishable from a garden variety breach of

contract claim."); Holmes v. Lorch, 329 F.Supp.2d 516, 527 (S.D.N.Y. 2004) ("Promissory

estoppel is a rule applicable only in the absence of an enforceable contract.") (quotation marks

omitted).  As such, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (internal citations omitted).

   With its promissory estoppel claim against Orr, SungChang seeks nothing more than a second bite at the breach of contract apple. SungChang admits that it held a binding and enforceable contract with SMA, even suing SMA for breach of contract in this suit.  See Count VI (Am. Compl. ¶¶ 102-106).  Neither SungChang nor Orr disputes the validity of that underlying contract with SMA.  SungChang's promissory estoppel claim is "precluded by the fact that a simple breach of contract claim may not be considered a tort unless a legal duty independent of the contract—i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself—has been violated."  Brown v. Brown, 12 A.D.3d 176, 176-77, 785 N.Y.S.2d 417, 419 (1st Dep't 2004).  SungChang's claim for promissory estoppel is based on the same obligations SMA failed to perform under its contract with SungChang. Given the undisputed presence of an enforceable contract, SungChang's promissory estoppel claim is "indistinguishable from a garden variety breach of contract claim." Hughes, 452 F. Supp. 2d at 306 n.19, and must be dismissed.

   VI. Unjust Enrichment/Quantum Meruit (Count XI)

   SungChang also brings a claim for unjust enrichment as to New SMA, Orr, Atanasio and R&R.  To prevail on a claim for unjust enrichment under New York law, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000); Diversified Carting, Inc. v. City of New York, No. 04 Civ. 9507, 2006 WL 147584, at *7

(S.D.N.Y. Jan. 20, 2006). Under New York law, where the damages alleged in a complaint arise from the defendant's breach of a contract, the plaintiff's remedy lies in a contractual claim, but where the claim is quasi-contractual in nature, the plaintiff may bring a claim for unjust enrichment. Friedman v. Wahrsager 848 F.Supp.2d 278, 294 -295 (E.D.N.Y. 2012) (citing Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006).

Like a promissory estoppel claim, "[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement*." Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 586-87 (2d Cir. 2006) (citing Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (N.Y. 2005) (emphasis in original); Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d at 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 ("A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment."). However, this is only true where the claim arises out of the same subject matter. Hughes, 452 F. Supp. 2d at 315 ("[P]laintiffs' written agreement with [contracting defendant] does not, as a matter of law, bar a claim for unjust enrichment against non-parties to that agreement whose alleged conduct falls outside of the subject matter of the agreement.")

In Hughes, despite the existence of a valid contract, Plaintiffs were permitted to maintain an unjust enrichment claim against Defendants, third parties to the contract who had allegedly wrongfully obtained plaintiffs' assets. The assets were intended for the company in which Plaintiffs had invested, and defendants' actions deprived plaintiffs of the value of their investment. 452 F. Supp. 2d at 304. The court reasoned that the existing contracts "[did] not set

34

forth plaintiffs' rights and obligations with respect to the . . . Defendant [so] plaintiffs' binding

agreement with BCI should not preclude plaintiffs from proceeding in equity" against the

unjustly enriched defendants.  Id.  "To hold otherwise would subvert the logic of [this] equitable

doctrine . . . which is designed to prevent unjust enrichment where the absence of an enforceable

contract otherwise prevents recovery from [the culpable] parties." Id. (citing Seiden Assocs., Inc.

v. ANC Holdings, Inc., 754 F. Supp. 37, 41 (S.D.N.Y.1991) (internal quotation marks omitted).

Here, although SungChang alleges breach of contract against SMA, this does not disturb

its ability to also seek unjust enrichment against third parties by virtue of the alleged transfer.  If,

as alleged, New SMA received the assets of SMA by avoiding SMA's liabilities, including debt

owed to SMA's creditors, there is no basis for a breach of contract claim as to the new entity.

Furthermore, SungChang's allegations underpinning the unjust enrichment are different from the

allegations of breach of contract.  In particular, SungChang alleges the improper change of

ownership of SMA's assets first through the surrender of its assets to R&R and then the sale to

New SMA.  Thus, recovery in quasi contract is still permitted to prevent the third-party's unjust

enrichment.

SungChang alleges that New SMA benefited from the value of the handbags delivered to

SMA."  It alleges that New SMA was able to obtain all of SMA's inventory without making any

payment to SungChang and thus "New SMA, and its CEO Atanasio, were able to purchase

SMA's assets at significant discount" (Am. Compl. ¶ 142).  Although not in the section

concerning unjust enrichment, SungChang also alleges that R&R was to receive a total purchase

price of not more than 1.5 million from the sale of SMA's assets to New SMA, for inventory

R&R never paid for (except its opening credit bid of $300,000), including handbags shipped to

SMA shipped by SungChang for which payment was never made (Am. Compl. ¶ 62).  At this

stage, these allegations are sufficient to state a claim for unjust enrichment, but only as to New SMA and R&R.

As to the individual defendants, SungChang does not allege that either Orr or Atanasio benefited personally from the alleged transfers. If SungChang's claim is based on Orr and Atanasio's respective roles as CEO of SMA and New SMA, the allegations still fail because SungChang alleges no basis to pierce the veil to make them liable for New SMA's alleged unjust enrichment.

The sum of SungChang's argument is that Orr, with Atanasio's assistance, wrongfully transferred the assets from SMA to New SMA. But that is not an allegation that Orr exercised control and domination over *New SMA* or diverted money from *New SMA* to his own personal use. New SMA is the alleged beneficiary of the improper transfers, not SMA, and SungChang only successfully alleges that Orr exercised control and domination over SMA. To the extent SungChang makes such allegations about Orr's relationship to SMA, those allegations do not change the fact that SMA had a contract with SungChang that precludes related unjust enrichment claims.

As to Atanasio, SungChang does not allege facts that merit disregarding New SMA's corporate formality. As discussed above, although SungChang alleges that Atanasio had total control over New SMA, it does not and cannot allege facts that Atanasio abused the corporate form of New SMA.

The unjust enrichment claims are dismissed as to Orr and Atanasio.

VII.    Punitive Damages

36

Lastly, R&R challenges SungChang's ability to seek punitive damages and moves to strike the demand for punitive damages. (R&R Mem. at 20-21). Under New York law, punitive damages are generally not recoverable unless the claim "goes beyond remedying private wrongs to vindicate public rights." Rocanova v. Equitable Life Assur. Soc. of U.S., 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940, 943 (N.Y. 1994); Conocophillips v. 261 East Merrick Road Corp., 428 F. Supp. 2d 111, 128 (E.D.N.Y. 2006). "Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." Rocanova, 83 N.Y.2d at 613, 612 N.Y.S.2d 339, 634 N.E.2d 940; New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y. 1995) (punitive damages recoverable only "if necessary to vindicate a public right"). Rocanova relied on the principle set forth in Walker v. Sheldon, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (N.Y. 1961), that exemplary damages are recoverable in cases of fraud and deceit involving "high moral culpability," provided the conduct was "aimed at the public generally." Conocophillips, 428 F. Supp. 2d at 128-29.

The Second Circuit has reaffirmed the necessity of the "public aim" requirement to permit punitive damages as an available remedy. TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 94 (2d Cir. 2005) (rule set forth in Rocanova and New York University "has not been changed by the Court of Appeals, and we have no reason to question its continued vitality"); see Morris v. Flaig, 511 F. Supp. 2d 282, 296 (E.D.N.Y. 2007) ("Rocanova and New York University both noted that punitive damages should only be available where they are necessary to 'vindicate public rights,' and in regular private contracts, the only time that generally occurs is where the alleged breach of contract targets the public.")

Thus, in New York, a plaintiff may recover punitive damages only if the plaintiff demonstrates (1) that the defendant's conduct is actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.  New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 130 (2d Cir. 2001) (quoting New York Univ., 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763)).

While SungChang has for the purposes of a motion to dismiss, met the first and third element on some of its claims, it falls woefully short of alleging that the alleged fraudulent conveyance is part of a pattern directed at the public generally.  At base, SungChang brings a private action with the sole purpose of recovering debts owed as a creditor of a now-defunct entity.  There is no allegation that the public was harmed by the Moving Defendants' alleged activities or that a greater public interest will be served by punishing them.

SungChang cites Excelsior Capital, 2012 WL 4471262, at *7, for a more relaxed punitive damages standard, but the case on which Excelsior Capital relies, i.e., Stein v. N. Assur. Co. of Am., No. 09–CV–1029(TCP)(AKT), 2012 WL 1605365, at *8 (E.D.N.Y. May 7, 2012), clearly applies the Walker standard and its requirement that the alleged misbehavior is directed at the public generally. SungChang also relies on Cadle Co. v. Lieberman, No. 96 CV 495(RR), 1998 WL 1674549, at *14 (E.D.N.Y. Sept. 11, 1998), in support of its argument that punitive damages may be permissible in fraudulent conveyance claims "when a defendant's conduct is found to be gross and wanton and to involve high moral culpability."  But this reliance is misplaced as Cadle predates the unambiguous and binding determination that public aim of the alleged tort must also be alleged.  TVT Records, 412 F.3d at 94 ("New York law only permits such an award when a defendant's conduct is 'part of a pattern directed at the public generally'"); New York Marine,

266 F.3d at 130. Furthermore, punitive damages are typically not awarded in a fraudulent conveyance action because "removing property from the reach of a creditor is not misconduct so gross and wanton as to justify such punitive damages." Marine Midland Bank v. Murkoff, 120 A.D.2d 122, 131-132, 508 N.Y.S.2d 17, 24 (N.Y. App. Div. 2d Dep't. 1986) (internal citations and quotation marks omitted). "The remedies [the fraudulent conveyance law] provides are clearly geared toward re-establishing the status quo ante, rather than punishing the debtor." Id.

Therefore, SungChang's demand for punitive damages is stricken.

## CONCLUSION

In summary, the Motions to Dismiss (Dkt. Nos. 23, 26, 31, 33[7]) are adjudicated as follows:

- Orr's motion to dismiss the fraudulent conveyance claims (Counts I-IV) is DENIED;

- Orr's motion to dismiss the conspiracy to commit fraudulent conveyance claim (Count V) is DENIED;

- Orr's motion to dismiss the fraud claim (Count IX) is GRANTED;

- Orr's motion to dismiss the promissory estoppel claim (Count X) is GRANTED;

- Orr's motion to dismiss the unjust enrichment claim (Count XI) is GRANTED.

- Atanasio's motion to dismiss the fraudulent conveyance claims (Counts I-IV) is GRANTED;

- Atanasio's motion to dismiss the conspiracy to commit fraudulent conveyance claim (Count V) is GRANTED;

- Atanasio's motion to dismiss the unjust enrichment claim (Count XI) is GRANTED; and the Amended Complaint against Atanasio is dismissed in its entirety.

- New SMA's motion to dismiss the fraudulent conveyance claims (Counts I-IV) is DENIED;

- New SMA's motion to dismiss the conspiracy to commit fraudulent conveyance claim (Count V) is DENIED;

---

[7] The motions filed at Dkt. No. 31 and 33 are identical motions filed by R&R.

- New SMA's motion to dismiss the successor liability claim (Count VIII) is GRANTED in part and DENIED in part;

    o SungChang may proceed with discovery on de facto merger, mere continuation and fraud theories against SMU Corp.;

    o Sung Chang may proceed with discovery on the mere continuation and fraud theories against SMU LLC;

- New SMA's motion to dismiss the unjust enrichment claim (Count XI) is DENIED.

- R&R's motion to dismiss the fraudulent conveyance claims (Counts I-IV) is DENIED;

- R&R's motion to dismiss the conspiracy to commit fraudulent conveyance claim (Count V) is DENIED;

- R&R's motion to dismiss the unjust enrichment claim (Count XI) is DENIED;

- R&R's motion to strike the demand for punitive damages is GRANTED.


SO ORDERED.

Dated:          September 25, 2013
                New York, New York

                                    _____
                                    ANDREW L. CARTER, JR.
                                    United States District Judge